I am Brigham Ricks, representing the plaintiff and appellant Robert Eringer in this matter. Does this conflict relate only to the last six months or whatever it was of your client's employment? The district court – so my client's claim is that he was not paid for the last three months of his work. He worked on a quarterly retainer basis. What the district court decided to do in this matter when it ordered jurisdictional discovery was to only limit discovery to this last three-month period. And most of the analysis in the court's decision only involves this last three months. And I think that's very unfortunate because if you want to understand the nature of a contract, especially an oral contract, you should look at the entire course of dealing. And if you just pull out one segment at a time, it's going to be taken out of context. I'm not sure how much that helps you. I'll just put my cards on the table as I think I now have them. And that is, this is not an ordinary contract between a private person and somebody for various forms of, I don't know, spymaster, intelligence gathering, or private whatever it is, because this is not a private person. This is the person who has become the reigning monarch of Principality of Monaco. And I have trouble seeing how a contract between the reigning monarch and someone to provide various forms of intelligence and security can be seen as anything other than closely related to the affair of the state of which he is the reigning monarch. That's my problem with your case. Okay. Let's look at an issue that the district court analyzed quite in depth during this last three-month period was the issue of maintaining liaison relationships with foreign intelligence partners. In that situation, we had a private independent contractor, Mr. Erringer, who lived a half a world away from Monaco in his home office in Santa Barbara, California, taking some phone calls and exchanging e-mails with some liaison partners. Then he would report back to Prince Albert, but not directly. It would go through a facilitator of these communications, Mike Powers, an American friend of Prince Albert who lived in Monaco, owned the local bar, and was not a government employee. There's almost no government involved in this process. I mean, yes and no. I mean, what do I do with the fact that while you may say there's no government involved, this is a contract with the reigning monarch, and it seems to involve what would ordinarily be considered affairs of state. Right, but in this situation, especially with the example I just gave you, you would think intuitively that's a quintessential government activity, but the way that Monaco had it set up involving just private individuals not involving the government at all, I think the facts show this wasn't a quintessential government activity, that private parties were engaged in it. What do you mean not involving the government at all? I don't follow what you mean by not involving the government at all. We had Mr. Arringer who was not a government employee. I think we have agreement among the parties he was not a civil servant. Right, right, right, right, but not involving the government at all? Because Mr. Arringer, who was outside the government and has always maintained his service was outside the strictures of the government, he did his work as he was contracted to do, and then he would involve this other. Contracted with whom? With the Principality of Monaco. So you lost me completely on not involving the government at all. The contract is with the Principality of Monaco. It's to provide information to the government of Monaco. How is this not involving the government at all? Because of the way this whole process was set up. Is it because, is your position that because there's a private intermediary, this bar owner, that that takes it outside of involvement with the government? Not only that, but that helps take it even further outside the strictures of the government. As opposed to the case that's been cited, UNC Lear v. Saudi Arabia. In that case. That's easy, that's the military. Right. Finish answering Judge Trott's question. How does it not involve the government? Because Mr. Arringer had no direct contact with that government. That's all? Because there's an intermediary? The intermediary is an agent and has a direct contact with the government. Am I right? And that intermediary had a direct contact with Prince Albert. So how is that not involving the government? It does, but Mr. Arringer was not part of that. Oh, you know, I can't always speak for myself. This argument is not passing the straight face test, not involving the government. Let me ask a different question. Your position below, according to the district court's decision, is, he says, Arringer concedes that his principal duties under the agreement involve maintaining liaison with foreign intelligence agencies. That's your point down there. And the finding of fact in this decision is that Arringer's primary role was maintaining liaisons with foreign intelligence services. The scope of our review of a finding of fact is what? Clear error? Is that what it is? Yes. All right. Can we find clear error in that finding of fact, given the fact that your own client is pushing on the court? He's literally showing his calling cards. His declaration is his primary role was maintaining liaisons with foreign intelligence services. Doesn't that really put it squarely within the FSIA and not within an exception? No. I believe in this case it looks like a commercial activity because of the way that we had this arrangement set up with Monaco. Not involving the government. Working very outside of it. He's working from his home office in Santa Barbara. And how could that be considered a quintessential government activity? I'm trying to make chicken salad out of chicken feathers here. It's not working. The suit puzzles me in a way. I mean, we're talking the damages sought are 40,000 euros or translated into dollars, so we're talking maybe, I don't know, $55,000. Correct. The length and level of detail of the allegations in the complaint do not seem to me to be compelled by Iqbal. Compelled by what? Do not seem to me to be compelled by the Supreme Court's decision in Iqbal. It seems to me that something else is going on in this lawsuit than a mere lawsuit for the recovery of cash, in other words. Oh, whether there are other issues between the parties outside of this breach of contract case, yes. Yes. And it occurs to me that it's possible that one of the aims of this lawsuit is to make public how unhappy he is with Prince Albert and the embarrassing things he knows about Prince Albert. No, the purpose of the lawsuit is to collect on an unpaid debt. In this case, we have I understand the ostensible purpose of the lawsuit. And I also think this is bringing up that issue, I think this is an important distinction between other cases here, is that we have an individual, he was contracted to provide a service, provides a service, is unpaid for it, terminates his contract, brings a collection action. In all the other cases, I think with just one exception, involving employees of various sovereigns, those cases all deal with employees who were fired, who were terminated. And then they subsequently brought lawsuits alleging things like discrimination, harassment, even torture. And that distinction of whether he was fired or not is important because when we get to the case of Broadbent versus the Organization of American States, which is a case where employees were fired and brought a wrongful termination lawsuit. In that case, the court found that the purpose of the Foreign Sovereigns Immunity Act was designed to protect sovereigns to avoid being embarrassed by having their political decisions reviewed by a foreign court. And in this case, we don't have any political or policy decision that needs to be reviewed. We just have the simple matter of whether a bill is owed. Yes, but look, employ the test utilized in the Ninth Circuit decision of Holden against the Canadian consulate. And I think that decision says to determine whether or not his employment, your client's employment falls within an exception to the sovereign immunity of the FSIA. We're supposed to focus on the nature of the employment. I go back to the same statement that was in the record. Aren't you yourself saying that the nature of his employment is governmental? It's maintaining liaisons with foreign intelligence services. It's intelligence gathering about the sovereign. And indeed that he says that, and this is what your client is saying, he speaks on the prince's behalf. If we look at the Holden issue and focus on the nature of his employment, it seems to me your client's own position is and results in it not coming in within the commercial exception to sovereign immunity. I would disagree because in his retainer, he was not granted any special governmental rights or privileges or authorities. He had no police powers, could not exercise a search warrant or wiretap. He says he's supposed to get free passage and unlimited access to foreign officials. There was a phrase there that other governments are supposed to give him free access, something along those lines? No. He received a card, asked the prince to sign a card, because he frequently had to travel through France to get to Monaco and was worried that he would be detained by French authorities wanting to know what's he doing with Monaco. And so the purpose of that card was to help, in case that situation ever arose, would maybe be helpful in helping him avoid that situation, which it never did arise. I have to say I had the same reaction that Judge Fletcher did when I looked at this. This lawsuit seems to me nothing more than an improper vehicle to try to spread trash about HSH. All these allegations in here that have nothing to do with commerce, blackmail videos, rapes, illegitimate daughters and stuff like that, I mean, that's not commercial and it just looked like simply a, we're going to put all this garbage in here, you better pay me. No. I have to tell you, that was my reaction. Why is all that garbage in there? What does that have to do with commercial activity? Because in our previous dealings, prior to filing the lawsuit, Monaco denied anything to do with Robert Erringer. I wouldn't recognize that he ever worked there. I wouldn't respond to any communications. So in response, you decided to dump, put a dump load of garbage on his head. No. The purpose was to prove that there was a contract there that he would. What does all that dirt have to do with commercial activity? Those were the tasks that he was assigned to deal with. And are those commercial activity? I would say yes. They did not involve any quintessential government activity. I'll reserve the balance of my time for rebuttal. Okay. Thank you. May it please the Court, I'm Clifford Sloan for the Principality of Monaco. A few brief points in response to Mr. Rick's argument, Your Honors. First, in terms of whether it was governmental activity, Mr. Rick's, in this argument, advanced for the first time a new version of the claim, which is that it's because there was an intermediary, Mike Powers. That directly conflicts with Mr. Erringer's testimony, in which he said that he reported only to the prince and with the positions that he took below. And just for example, I would refer the Court to pages 216 to 217 of the excerpts of record, where there's an excerpt from his deposition, and the question is, in your opposition to the motion to dismiss Mr. Erringer, you say, quote, Erringer only took orders from and reported to Prince Albert, close quote. That's your declaration. Actually, paragraph 3, is that true? Is that correct? Answer, yes. That the only person that you reported to was Prince Albert. Correct. Answer, yes. And the only person that you took orders from was Prince Albert. Answer, yes. So if Mike Powers, the intermediary he was referring to, told you to do something, that was not going to influence your judgment as to whether it was appropriate to do as part of your duties. Answer, Mike Powers had no authority whatsoever to instruct me. Now, in addition to that, as has been pointed out, Mr. Rick's, on behalf of his client, and as the district court pointed out, conceded below that it was that the intelligence liaison activities, it's a governmental function. If you want to see the excerpt of that transcript, it's in the supplemental excerpt of record, page 3, where he quite clearly concedes that. And that activity of liaison with intelligence activities is really what this claimed contract for the first quarter of 2008 was all about. In paragraph 15 of his complaint, he says that was the sole function during that period. In the deposition, he says, well, there were some additional investigative responsibilities, but he also testifies, as the district court quotes a few times, that it was the main event, the main activity, the most important role. It's clearly that that was the heart and soul. And it's clear as a general matter that in terms of liaison with intelligence services and in light of the evidence here, both the identification that he attached to his complaint and that he quotes from in the complaint and his deposition testimony and his declaration that this was a governmental function. If the Court has no further questions, I'm happy to rest on the briefs. I think we don't. Thank you. You've saved some time. Thank you. Regarding the issue of Mike Powers, also in the same deposition, Aarons was asked about Mike Powers, and he said, Mike Powers played a logistical role all through the five and one-quarter years. Mike played the role of facilitator, passing messages back and forth that had to do with logistics. Question, was he tasked with facilitating? Who tasked him to do that? Mike Powers? Prince Albert did. Question, when did he do that? Answer, from the very beginning. If your question is, yes, is asking for a specific date, I believe it was June 16, 2002. So Mike Powers has always had this role of facilitating communications between Robert Erringer and the prince. So he was a facilitator. Yes, Your Honor. That's all. Yes. He helped facilitate communications between the two parties. But I don't think that changes the function served by your client. Another analysis that the trial court went into in its order was regarding these specific investigative directives that occurred during this last quarter of service. And in there, the court finds that these activities, whether it was trying to brief Prince Albert about people with criminal records trying to come into his influence, and other activities, the district court characterized them as those being of a private investigator. But since they involved a sovereign leader, they must be governmental. I believe that's an error because the court is looking at the purpose of the work and not the nature of it. If the nature of the work was to be that of a private investigator, then it shouldn't be considered governmental in nature. And in conclusion, I just want to point out the following facts, which are not in dispute here, that Robert Erringer was not a civil servant, he was not a diplomat, he was not a soldier, and that he did not engage in any quintessential government activities. Both Monaco has stated that, and we have stated that. And if there is unanimity among the parties here about those facts, then the contract must also be considered commercial in nature, and sovereign immunity should not apply. Thank you. Thank you. Thank both sides for their arguments. Erringer v. Principality of Monaco submitted for decision, and that completes our argument calendar for this morning. Thank you. All rise for the second hearing.
judges: Stein, Trott, Fletcher